This morning and that is Art vs. Electronic Arts for EA. Number 11-3750 and that's Mr. Rubin and Ms. McNamara. Is that correct? Whenever you're ready. Thank you. I'm Michael Rubin for Fine Arts. I don't know if I might be certified, but absolutely. For First Amendment right of publicity balancing purposes, the critical fact is this. NCAA football will be the same game with the same degree of expressiveness if, instead of being populated with highly realistic likenesses of real players in violation of the right of publicity, it will pop in the head and be stacked with anonymous stuff. We have to take a step back because if there's one thing that brings something clear to us is that there's a number of ways of looking at these types of issues. There's a number of tests that are in use and when you use those tests, various courts come out differently using the same type of test. What would you suggest to us, and I would ask the same question Ms. McNamara should give us, are some of the core control principles that we should take into consideration in any case of this kind. Right. First and most important, the test has to be a balancing test. The Supreme Court taught us that. It was a key. And each of the cases, including the Supreme Court's ruling here, applies some sort of balancing test. He didn't understand that. He didn't want to hear that. Let me, along the same question, let me say it has to be a balancing test. And as General said, I think they all have a part of that. So what's your case that some of the parties have brought the application because it's not the balancing test. What's your best case? The best case is the TCI, but also the California cases. We call that a balancing test. It's a really simple balancing test from our perspective. Balancing means you true balance it. You would have to consider the relative weight of both the right of publicity and the First Amendment. If you focus on how the player's likeness is used, how the celebrity's likeness is used, and ask whether that use first infringes upon the right of publicity to determine the strength of the right of publicity interest on the one hand, is it a commercial exploitation of the available likeness? And then you look to see how that likeness is used in context of the game. That's where the second part of balancing comes in. The question is not whether the game itself or the work itself has some First Amendment value. In all of these cases, no matter which way they come out, there is expressive content to the game. But for there to be true balancing, you have to see how the likeness is used. Is the likeness used for satire or commentary? Is it used for parody? Is it used to make a social statement? One of the things that before that, you'll look at the cases and they'll say, is it used for a commercial versus a non-commercial purpose? In the context of these First Amendment issues, so at least the word is put up as a defense. How do you distinguish commercial versus non-commercial? It's a conflict. The cases are a little confused and a little hard to clarify. You are correct in the sense that you know that the threshold issue is whether it's commercial speech or not. That's hard to articulate. This is not a commercial speech case, so that will be the threshold. Then the question is, is the use of the likeness predominantly to take advantage of someone's right to listen to a commercial game, or is it for a non-commercial expression? What are you saying about commercial use? Think of it as a commercial game. Do you think that some of the commercial games and some commercial use for these purposes are based on what? Analytical. The answer is yes. The answer is yes. The reason the analytical is in the case, and the focus, by the way, is not distinguishing between commercial and non-commercial uses and all that. Analytical just indicates you start with an exploitation for commercial use. These cases only arise if the defendant's intent is to appropriate someone's likeness for a commercial game for a profit motive. Otherwise, you don't have an issue at all. Is that what you were stating at the beginning in your allusion to anonymous players, or were you going somewhere different? That's essentially what I was doing. I was applying the facts, in this case, of the test. But let me finish articulating the test. The focus isn't as much between commercial and non-commercial uses, because all of these cases involve commercial uses. The question is whether the defendant was made a kind of sublime infringement upon the First Amendment rights of expression. And that's why the inquiry is, how did they use Reinhart's likeness? Why did they make the reckless quarterback, number 14, right-handed person, number seven, without those attributes, rather than using anonymous characters? The game would have the exact same level of First Amendment expressiveness if they didn't appropriate Mr. Hart's likeness. Our test, and the test that the courts like No Doubt, Keller, Davis, Comedy 3, and many of those apply to us. It's interesting to see whether there's a significant infringement by that use on First Amendment expressiveness. And the way to test that is to determine if you insert the likeness away and use someone else's likeness or the likeness of no actual individual, you factor in the use expressive. Is there satirical? Is it used for satire or parody? Is it used to comment on the role of athletes in society? And as I was starting to interpret in my ages to make the point that if you didn't appropriate Reinhart's use in this case, you would be achieving the exact same First Amendment goals, engaging with the same exact person in the discussion. The games would function the same. They would have the same level of interactivity. They would be just as alterable, but they wouldn't serve a player of the likeness. The reason why VA uses these realistic likenesses, as Judge Wilson found, was because that appeals to them. That increases marketability. That is not a First Amendment protected right. That is a micro-publicity protected right. And that's why in the balance, when you use a highly realistic image of a real player that has commercial value, that satisfies the underlying policy attributes of the right of publicity, the protection of goodwill encourages someone to look hard to develop talent, the avoidance of dilution of name, depersonal integrity, personal harmony and dignity, components of the right to assess someone's personality and partners will be used. That's why it decodes and shreds. And that's why not all of the good is noted down. Obviously, this is not the federal commission proposing phase of the transformative attempt. And I know that Judge Wilson applied the transformative act. Judge Wilson and others. If you apply the transformative use test, I presume that your argument would be, look, when you look at the game, it's really about exploiting the stars, like Riding Hard. Because nobody's buying the game because you can make Michael Vick right-handed or you can make the Sean Jackson 6'6", you know, 300 pounds and run like a wind. You're buying the game because of its realism and because it is identifying individuals who, for whatever reason, identify with school affiliation and you just like them well. Sure. I certainly agree with your second point. I disagree with part of your first point. I think we do embrace the transformative use test. My problem here is the labeling of the test, and I think that's what Judge Hancock was getting at. Transformative use, to me, isn't a very accurate label because it's subject to misuse when you focus on transformation. It seems to carve out unrealistic uses. But the concept, the way you apply it, focusing on the likeness, we absolutely embrace that. We can predominantly use better characterizations, but, of course, we do adopt a transformative use test. If the question is, how are you transforming the use of the individual, which gets into, I think, the most important point that he integrates, which is, would the use of any use test, however you characterize them, prevent the use of a realistic figure in some sense? In the end, there is definitely not. Let me ask you this. How far back can you pick a team under the current EA college system? Could you pick, for example, the Alabama team from the 70s? I am not able to create anything you want to, I suppose, but the way it's presented is the most recent team with the most recent budget. It goes back quite a ways. You can build it forward. I'm not aware of… Could the college Alabama team play a past Alabama team that was considered in the top five in the country? So they're saying, okay, let's see how this plays against that era. Could you create an avatar, for instance, not with 70s but with 60s, with your name, but with the Alabama… Any user can modify the game. That's not what EA does. And, of course, any user could alter the greeting card and built-in. Any user could modify the… When did EA start putting out the college game? What year was it? I'm not sure. Was it 10 years ago? Within the last 20 years. Okay, so let's say you take a team from the earlier EA and it could play versions, and it could play a team from the current version, could it not? You could set it up to do that. And wouldn't that be deemed to be a transforming of expression? No. Not under our characterization. Let me distinguish between arms and the transformative list and the disparate parts of the transformative list. My point is that it's not real. They didn't really do that. I'm setting it up because that's what I want to do. Nothing in these games is real. Nothing is historically accurate. Everything just goes along chronologically. But that's also the case with the Nougat, the band. You start with the players that you identify with, that you are a fan of. You choose to play them. That's the default. That's what's presented to you. If you want to create a fantasy team as a user, you pick a fantasy team. But that's not what EA does, and that is not how Lionheart's likeness is used. If you focus on the transformation of Lionheart and his likeness, that is presented as he was when he was doing what he does in the setting in which he was made famous. That is the core element of the game. The problem is that Lionheart probably isn't remembered by too many people today other than maybe by our records fans. I mean, I view a lot of these former players as if they had a shelf life of core opinions. They don't last a long time in terms of memory. I have a lot of credit opinions. I have that. I think that they're a great product. All that is associated with the strength of the damage. Does he have a right to listen? That was conceded for purposes of this case. Is it economically valuable? Presumably, yes, because we know EA pays a lot of licenses and credits. How much does it worth? Maybe if you were on the jury, you would conclude that it's not worth that much. But for purposes of this analysis, in determining what the proper standard should be, which is the most important factor, in determining whether the district will apply that standard correctly, which is the second major inquiry, it doesn't matter how strong or how weak, how well remembered or not. We have to assume that this is a core element of development. Two, in effect, schools of thought as to what people are looking to courts for here. One is, as the law professor's group notes, you need something that gives us some certainty, so that you know going in that there isn't this possibility, this doubt, that the court may find you liable for having violated someone's right of publicity. Versus you have, that's what judges are for, on the other side of the coin, and they make decisions based on facts, and that's what they do. The trouble with the second point is that in many cases, there would have to be that you can get many different songs that they never even thought of, let alone ever play, and say that that's a violation. Then you can get Kirby, and say, then we get Kirby, and you can go just the opposite way. I would seem to argue that maybe you just have a little threshold behind your desk, and the judge doesn't have to take a field. We disagree. Of course, you can box their lines under the First Amendment as in any legal doctrine, where it will be clear which side you go on, but we can talk about the Supreme Court that the line here has to appropriately balance competing interests, so the choice to find the appropriate line has to be balanced. The problem is that different panels balance differently. Because the different panels don't apply the test that we're advocating, which is precisely this. First, you determine whether the work overall is expressive, and that gets you into balancing on that unit. Then you ask whether there's a violation of the right of publicity, and if there is, then you know you have to get to the balancing act. So what test do you apply? You do precisely what the California Supreme Court said in Common Theory, page 4 or 5. You look to see whether the literal depiction for commercial gain directly trespasses on the right of publicity. And these are key words. You have to add a significant expression beyond that trespass. If you narrow those, the problem in many of the cases, is this expressive, the person who presented it, the value added, the correct test is what value are you adding to the First Amendment that expresses this by appropriating the commercial gain value. That is a preliminary test. All of the cases come out the right way, and in the wrong way. When you apply that test, it is meaningful. If you're saying you have to apply that test, is there any instance where the DA could use the likeness of a player, a corporate firm, and not violate the test? Sure. I was thinking in the newspaper, and a lot of instances talk about recruitment abuses and the whole call to action society. And let's say, sure, and let's say that a game is not about recruitment abuses. You use action players in order to let you explore their world, to make a comment on society. We've had many examples of realism in the series. This is one example of realism. The point of the game is not just the game. All games are interactive. It's just planning. It's not football. But the point of the game is to make a comment on the most important social issues. That as for it would be a different game if you didn't have markets to create as the central figure in what happens in the game. Then you can use some made-up person. And that would have consequences. So the point of the test that we use is a real depiction. Is it a commercial game? Does it have significant person and content in that instance? Yes. Because the reason you need to have markets to create is because only by pointing to the way he was taken advantage of are you making a comment on the abuses of the current recruitment system. Same token with plenty of examples of realism. It was the depiction of characters that were not part of the first amendment. If you take an avatar of a young Tom Cruise or a young Tom Wayne and say, I'm going to ask him to do this and he does this to them, that should not be the setting of the first amendment. That is a major exploitation of that individual. If you take, if you have a video, if you have non-scene-producing video and you use an international group and the user has modified how that person is using that video, that would be for non-expressive purposes because it couldn't be anyone's second to have that video. And you would define the individual. So our test accommodates that broad range of issues. No, I know that. I'm about to respond to that. I'd like to ask a completely different question. If I may. This is a purely straightforward question. Why shouldn't we serve our community in the same way? I just think it's a good question. There's an important statement about how to serve testers. On that application, you have to, you know, if you do this, you have to think about which test you choose. So the application is, you know, this is a question from California, this is a question from New York, and it's a purely state law question. One very important underlying component of the law is the state law. You need to determine at the outset Is there a single case that doesn't acknowledge that the choice of the test is a state law question? Yes. What case is that? I can't think of one. Because... I can't... I think it's... One or two sets of questions. Let me explain why we're here. Ultimately, when we're facing first-amendment balancing, the first amendment of the paper is a deficit of capital, right? And so how a state court or a state law happens to be a first-amendment difference. Now, different states have different rights to publicity. New Jersey happens to have the most extensive right of publicity. Pennsylvania, for example, has a much more limited right of publicity that only applies to commercial merchandising or commercial endorsements. That's a... New Jersey, though, encompasses every sort of use of commercial advertising. So it is a state law question as to whether there's been a violation of the right of publicity. That's a choice. But state laws are different choices. That's where you have to start. That's what I mean. We don't, and for this appeal, I would say, it doesn't matter because electronic arts conceded that whatever the scope of the right of publicity under New Jersey law, one part of the state had to have a claim, and Judge Wilson raised her opinion accepting that stipulation. So while we don't really know what the New Jersey state law balances the right of publicity law, as we have seen in prior cases, we do know that the state directed the country to adopt that right because, of course, there's so much judgment that was conceded by the electronic arts. But the electronic arts were the opportunity to address the decisions of the law and to address the other concerns you raised about how strong this right is when it comes to damages and betrayal. But for purposes of this appeal, we just have to assume that we've had a correlation. Let me ask you, if I go on to ESPN Classic and I find a Rutgers game from 2005, you'll have one of the players is a quarterback by the name of Brian Hart. Doesn't that make him, in effect, a public figure? And then what we're doing here in this game is you're taking that historical public figure, obviously not as famous as former presidents or things like that, but it's nonetheless a public figure, and you're putting him into a socialized environment. The game that's being played between me and someone else. Why isn't that fictionalized betrayal of real people, for Hart, the same as it is if you're fictionalizing a betrayal of a former president? Every right of publicity claim involves a public figure to the extent that they have developed a commercially valuable persona that they can capitalize on and they can monetize. So the question that you're asking, obviously, is is there a misuse of a public figure? Whether a quarterback or a president or someone else in a work of fiction necessarily protected by the first amendment? The answer to that question is no, for two reasons. One, it isn't a work of fiction. This is a game. This is a game where the user controls what happens. The user makes the work of doing business. The reason is it's a game with someone else for the purpose of their commitment. And would it be the same game would it have the same fictional components if instead of taking the commercially valuable opposite of Hart they used a 6'1", 100-pound, US Pants pocket passing quarterback from Ohio that didn't really exist and all of the first amendment expressive components would be exactly the same. The same crowd noise, the same announcers, the same crunch of the children's heads, the same statements that are recrited, the same use of the licenses that EA signs with the commercial licensing company to have the team's logo so it would still have records and still have something stated but it wouldn't steal it by Hart's image and therefore for balance and that's what makes the difference because neither of those just like you can't put a celebrity's face on a game of Tetris or Pong just as you can't have an interactive chess game where you open it up and turn it around which is good but a lot of staffs in New York and they're probably going to show up in a few years' time and they're not going to play because they're going to be drunk. But for some of them they'll never heal but the game's chess is chess whether it's Pong, Fish or Pong and football is football their head, their knee, their arm because of the use of these licenses and they shouldn't play because that's not what the game does. But when I asked you earlier if this player has a you know, sort of a short life to the point where I don't think many people really know but you said, I don't think he is he is important and I said, okay, so later on he was important and his importance as a public he's not as a public figure why can't you apply the same test to him and reply to a public figure and take that public figure and put them involved in some type of portrayal it's not realistically I mean, it's just not historically what they do in that particular situation. I don't mean to offend but let's go back to my what powers you there if you think you have an all right or a young a former president in a younger version or an older version that would be protected there is no first amendment protection that is tied to that individual in other words, the game the work that the teacher to his teacher a user could change code to chat it's still the same protected use of the to the students all of these cases that come out and whichever way they come out even cases that came out that favor the position of electronic the purpose was still on how this person the question is, is it fictional if it were fictional would there be cases obviously if you have a game involving  coming back to earth to see how people dance that's fiction and the case would be really easy if that were the only test but instead what the court did is they looked and tried to match up to decide whether there was a transformation of this particular character but for the printers a comic book with half animal half people who happen to look like Johnny and Edgar when we have printers the focus was on how those characters move it was a given it was a pantheon of lyrical context but that wasn't the answer it is the answer to remember that there is publicity left in any work not just a video or a movie but anything that has any expressive content because that is fiction or that expressive content because the person who goes beyond fiction will wipe out any of that publicity unless the document is properly proposed which would like to focus on the added value and be trimmed with it by the particular person thank you very much thank you for the back of the boat thank you thank you thank you David please record and thank the witness please stand there David's right to remain and I'm here on behalf of Electronic Arts I'm just a video if you could start with the initial question that I asked Mr. Rubin what are some of the core neutral principles that we should adopt before we weigh in as to what test we have and how we apply that test yes your honor I think there are core principles and what really the court is being asked here because this court has not adopted a balancing test in the rest of the area but the threat that has run through the court's decision which will have a great effect for the first amendment yes but it doesn't mean that every test is a balancing test whether it be obviously predominant use transformative use even while it was on pages 999 I think if you're thinking of using the word balance twice the restatement test appears to be quite similar so there is a balancing absolutely your honor and what we propose and I think the core principles that underlie any analysis and any balancing test is you're going to have to be weighing first amendment rights that are given here because these are expressive works as the Supreme Court made clear last year in the Directive versus Entertainment so core principles emanate from a first amendment expressive work and they go to many of the points being made by Mr. Hart I think what Mr. Rubin said I don't read about words in his mouth but it's almost as if what he's saying is that the first amendment is a wonderful and highly protective shield but it should not be used as a sword it should be used as a sword okay I disagree with using it as a sword but I want to answer your honor's question which is what are the core principles and what some of the core principles that emanate from the first amendment is there does not need to be a discernible message the Supreme Court has made clear early that no discernible message is required for a work to be expressive and to be fully protected by the first amendment whether it be the Jabberwocky versus Lewis Carroll or Jackson Pollock another core principle is that you do not need to that's probably the only statement of justice that people seem to give back to me time and time again that's a great statement and I totally embrace it here another core principle is that there does not need to do not look at the content of the speech and start judging the value of the content of the speech this court made clear in Jenkins more than 50 years ago you don't differentiate between entertainment or news you don't differentiate between highbrow or lowbrow it is not for the court's role to evaluate the content of the speech and the value to be attributed to that another core principle that I think emanates in this area is realism that realism is not a bad word there's no dispute here and I don't think anybody in this room would dispute that movies that use an actual name that uses an actual depiction of somebody in the place where they make famous social networks that was talked about in the papers that that is equally protected as a video game that also uses an actual name and actual principles and so those are some of the the core principles that I think needs to emanate the analysis I don't with all due respect agree that adopting the Rogers test is an abdication of those core principles or an abdication it's a much lower threshold that you need to get over in order to say you're protected by the first amendment I think that it's the principle that you can see where the lines are being drawn and they're being drawn appropriately it's looking is there a reasonable relationship between the use of elections and the market issue or is it a disguised advertisement and you can see it's not as hard as RGTS when you use words like holy unrelated to the content of the work I mean that's that's a pretty low threshold well there's I think that the cases have evolved and the cases that have applied Rogers have seen the blind and you can see where they're drawn you can see it in the Rosa Parks case by the Sixth Circuit where it was acknowledged that notwithstanding the use of the name notwithstanding the fact that the the lyrics included the phrase back in the bus move to the back of the bus that that was not covered and that did that would stay declined from Rosa Parks because there was no real relationship you see this I think very clearly in the civil case when we look at the Rosa Parks case and we look at the Ginger Rogers case isn't the focus entirely different than it is here you know Ginger Rogers didn't want anyone thinking that she was at all affiliated or related to Ginger and Fred and obviously Rosa Parks you know isn't that distinct from what we're hearing? I don't think so because I think what is in part driving this claim is the desire on the part of plaintiffs like Mr. Hart to be able to define how they're going to be associated with any product and whether they do or do not want to be associated with any product I think that's it I think that's what people are interested in isn't it? I was a football player they're using my likeness they're trying to get Rutgers fans interested in their product by using my likeness now it may be as Judge Ambrose says there aren't any Rutgers fans who are interested in Ryan's art I don't know I'm not a Rutgers fan but I mean that's what this is really about isn't it? Your Honor I think that that goes to really the question of whether what's being driven here is commercial use or not and I think that as has been advocated strongly by the Hart advocate here is that the WTCI standard should apply and that the court should really be looking at is this being a commercial use or not a commercial use and I think we should pause on that and focus on that test that test was articulated by the Missouri Supreme Court 10 years ago no other court has adopted it in the intervening period of time most certainly no federal court we strongly suggest that this court not do it is that because from your standpoint it's a low threshold? well no absolutely not I think it focuses there's two problems two serious problems with the DOE test the first is that I would argue that it's double dip this goes to a point being made I got Judge Tashima earlier before you get to the balancing test of the First Amendment you need to establish is there a is there a crime of facial claim and a component to establishing if there's a crime of facial claim invariably in the various states while there are different tests in different states invariably a component to establishing is whether the use or the likeness is being made for commercial purposes then what the DOE test does is that when it gets to the balancing test it double dips it comes back and focuses almost exclusively on the commercial use component again commercial use versus excessive use yes and look at that decision in DOE versus TCI which I'm sure you're on it now that it there it gives value to to the use and the expression there and that I submit is not the role of the courts to be judging the value or lack of value of expressive content that is not what the Supreme Court has advocated but even looking at the commercial component to it how does one determine whether you cross the indecipherable line into predominantly commercial and I take this as an example let's look at magazines it's no secret that the cover of magazines are in no small part dictated by who they think is going to sell the most magazines people love reading about the royal family they love reading about Kate Middleton I can assure you that People Magazine puts Kate Middleton on the cover every time they can find an excuse to do so I agree your honor it's some of the brother even more so but we don't think that the court should be stepping into the editorial meaning of magazines or EA and judging as to whether the commercial whether the decision to run an article about Kate Middleton is primarily expressive whether the value of the article has a great value whether it's really new that is not the problem and I think there's an irony about their application or desire to apply the Doe test and that would be that if you look at the way the court decided the Doe test they found that the likeness there for no relationship to the Tommy twist that his name was simply used he had no relationship whatsoever with the story there was a big creative story that caught me there I would argue that on the facts of the Doe case it would fail under the Rogers test the test that they find impossible to apply I can tell you a lot about the Doe test and what tests do it I think they can live very comfortably with the transformative use test properly applied first of all the Rogers test I don't think that's the right policy absolutely not sure I do not agree with that as I previously indicated I can come up with any number of scenarios where a use would fail under the Rogers test absolutely look at the Seal case in Seal there was a book a movie in a movie and the court found that there was not a reasonable relationship to the book the court found that it did not bear a reasonable relationship to the compilation he had nothing to do with the choice of music he had nothing to do with those recipes he didn't choose them that was the case your honor had a case last year it didn't get to the first amendment argument but in darcy versus black pro books last year it didn't get to    but in darcy        black pro  last year it didn't the first   but in darcy    books last black pro books last    get to the first first  argument but in darcy to the first amendment  but in darcy versus black  books last year it last year it didn't  the first get to   argument but in   it   the first amendment argument argument but in darcy  black pro books      darcy  black  books last year darcy  black pro books last argument but in darcy   books but in darcy black  books books last year it did not get to the first amendment argument but in darcy black books last that program last year it did not get to that program last year .